IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AGV SPORTS GROUP, INC.           :

    Plaintiff,                   :

v.                               :   Civil Action No. GLR-11-16

LEMANS CORPORATION,              :

    Defendant.                   :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff AGV Sports Group, Inc.'s ("AGVSG") Motion for Partial Summary Judgment (ECF No. 49). AGVSG seeks damages against LeMans Corporation ("LeMans") for breach of contract, or, in the alternative, under a theory of promissory estoppel. In particular, AGVSG asks this Court to enter partial summary judgment on two issues, affirming that: (1) AGVSG and LeMans were engaged in an exclusive distribution agreement between December 14, 2006, and August 31, 2009; and (2) this agreement required LeMans to purchase a minimum quantity of, and use its best efforts to promote, AGVSG's product.

The issues have been fully briefed and no hearing is necessary. See Local Rule 105.6 (D.Md. 2011). AGVSG's Motion for Partial Summary Judgment will be denied because disputed material facts exist as to whether an exclusive distribution agreement formed.

## I. BACKGROUND[1]

AGVSG is a Maryland corporation that designs, distributes, and licenses AGV Sport and AGVSPORT brand motorsports apparel, including boots, gloves, jackets, and accessories. LeMans is a Wisconsin corporation that distributes motorsports parts, accessories, and apparel from various vendors, including AGVSG. LeMans began distributing AGV products in 1989, at which time AGVSG did not yet exist. Rather, at that time, LeMans did business with AGV SpA, an Italian company, through its United States importer and designated resident agent, Michael Parrotte. In subsequent years, Mr. Parrotte formed AGVSG, a separate entity, which designs and markets an apparel line under the AGV name pursuant to a license from AGV SpA.

In 1994, AGVSG and LeMans entered into a written exclusive distribution agreement (the "Initial Agreement") for a term of three years, which, in the absence of sufficient notification, would automatically renew up to three times, each time for a three-year period. As neither party took steps to end the agreement, it continued through the fall of 2006. At that time, the parties were close to reaching an agreement (the "Licensing Agreement") that would grant LeMans an exclusive license and virtual ownership of the AGVSport trademark in the United States

---

[1] Unless otherwise noted, the facts contained herein are taken from the Complaint, Motion for Summary Judgment, Response in Opposition, and Reply.

and Canada.[2] AGVSG contends that, during negotiations over the Licensing Agreement, the parties continued their relationship pursuant to the terms of the Initial Agreement, via an "Interim Agreement," which continued the exclusive distributorship.

By fall of 2007, the parties had not yet signed the Licensing Agreement. Nonetheless, LeMans allegedly instructed AGVSG to begin operating under the terms of the Licensing Agreement, as its finalization was imminent. Thus, in reliance on the Licensing Agreement, and in anticipation of orders from LeMans, AGVSG prepared product designs for the next three riding seasons, but it ceased advertising, terminated its national sales manager, and laid off about half its office staff.

Conversely, LeMans contends that, while negotiations were ongoing, it discovered that AGVSG had neglected to disclose fully the extent of its rights to assign an exclusive license to LeMans. Accordingly, LeMans became uneasy over finalizing the Licensing Agreement. LeMans asserts that, by November 2007, it became clear that AGVSG would not be able to assign an exclusive license to LeMans and concluded that the Licensing Agreement would not be viable.

---

[2] Under this agreement, LeMans would assume all distribution, warehousing, advertising, marketing, and sub-licensing duties from AGVSG, while AGVSG would concentrate on product design, graphics design, brand development, and marketing support. (Compl. ¶ 12, ECF No. 1).

3

In any event, after December 13, 2006, LeMans alleges that the parties continued to conduct business on a purchase order-by-purchase order basis. To this end, AGVSG avers that, between November 2007 and February 2008, AGVSG and LeMans worked together to prepare LeMans's product order for the beginning of the 2008 season, supposedly agreeing that LeMans would place an order totaling $750,000.00 in wholesale value. Upon reaching this agreement, LeMans representatives purportedly informed AGVSG that they would submit a formal purchase order for the agreed upon items within two weeks of their February 2008 meeting. AGVSG maintains LeMans never submitted a purchase order, and, in fact, contacted AGVSG about three weeks later, informing AGVSG that it would go forward with neither the Licensing Agreement nor the 2008 product order.

AGVSG filed its Complaint on January 4, 2011, seeking relief from LeMans for breach of contract, or, in the alternative, promissory estoppel. (ECF No. 1). Following initial discovery and an attempt at alternative dispute resolution before a U.S. Magistrate Judge, AGVSG filed its first Motion for Partial Summary Judgment. (ECF No. 18). LeMans filed its Response on August 29, 2011 (ECF No. 19), but AGVSG later withdrew its first Motion for Partial Summary Judgment (ECF No. 21). After agreeing to an extended deadline for dispositive motions, AGVSG filed its second Motion for Partial

Summary Judgment on December 10, 2012. (ECF No. 49). LeMans filed its Response on January 16, 2013 (ECF No. 55), and AGVSG filed its Reply on February 4, 2013 (ECF No. 56).

## II. DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citation omitted). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48.

A "material fact" is a fact that might affect the outcome of a party's case. Id. at 248; JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a

fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. Rule 56(c) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

**B. Analysis**

AGVSG's Motion for Summary Judgment regarding the existence of an Interim Agreement for an exclusive distributorship between the parties will be denied because disputed material facts exist as to whether the Interim Agreement was formed.

AGVSG seeks to enforce the alleged Interim Agreement as an "exclusive dealing" contract under Section 2-306 of the Uniform

Commercial Code ("UCC"), Md. Code Ann., Com. Law § 2-306 (West 2013). Section 2-306 defines an exclusive dealing contract as "[a] lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods . . . ." Id. Under such a contract, the principal is expected to refrain from supplying any other dealer or agent within the exclusive territory. See id., cmt. 5. An essential element of contract formation is "'a manifestation of agreement or mutual assent by the parties to the terms thereof . . . [and] the minds of the parties must be in agreement as to its terms.'" Cnty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc., 941 A.2d 1181, 1209 (Md.Ct.Spec.App. 2008) (quoting Safeway Stores, Inc. v. Altman, 463 A.2d 829, 831 (Md. 1982)).

Because LeMans "is a body corporate [it] must act by its duly authorized executive or agent." N. Am. Accident Ins. Co. v. Plummer, 176 A. 466, 471 (Md. 1935). Absent a writing conferring such authority, it is a question of fact whether a purported agent had the authority to enter a particular contract on behalf of a corporation. Kennedy v. Mut. Life Ins. Co., 159 A. 780, 782 (Md. 1932). The party seeking enforcement of such contract bears the burden of proving this fact. Id. Thus, to prevail on summary judgment, AGVSG must establish that there are no disputes of material fact that LeMans and AGVSG were bound to an Interim Agreement for an exclusive distributorship, which

7

falls within the meaning of UCC § 2-306, and which AGVSG and those with authority to bind LeMans established through a meeting of the minds.

In its Motion, AGVSG asserts that the parties operated under the Interim Agreement for an exclusive distributorship between December 14, 2006, and August 31, 2009. (Pl.'s Mem. Supp. Partial Summ. J. ["Pl.'s Mot."] at 1, 4, ECF No. 49-1). The record shows that the Initial Agreement terminated by its own terms on December 13, 2006. (Ex. A ["Initial Agreement"] ¶ 13, ECF No. 18-2). Paragraph 19 of the Initial Agreement further specifies that any amendment to the agreement, including extension, must be in writing. (Id. ¶ 19). Additionally, Michael Parrotte, AGVSG's President, admits no new exclusive distribution agreement between the parties was ever signed. (Parrotte Dep. 130:2-7, June 8, 2011, ECF No. 55-3). Thus, the exclusive distribution agreement AGVSG alleges existed between the parties must have been a new, oral agreement. In support of the new, unwritten, exclusive distribution agreement, AGVSG relies solely on the sworn testimony of five LeMans employees.[3] (See Pl.'s Mot. at 4-10):

---

[3] In the background section of its second Motion, AGVSG points to pages 4-7 of LeMans's Opposition to AGVSG's first Motion for Partial Summary Judgment, indicating that LeMans (i) admitted to being the exclusive U.S. distributor of AGVSG products, (ii) would place orders directly with the manufacturer, and (iii) would pay AGVSG an agreed upon

8

(1) Jeff Hart, LeMans's Purchasing Manager, stated that "[a]fter December 13, 2006, LeMans simply operated as an exclusive distributor of the AGV Sport product line on a purchase order-by purchase order arrangement. (Ex. H ["Hart Affidavit"] ¶ 6, ECF No. 19-8). In his subsequent deposition, Mr. Hart further testified that "there was never any discussion or statements made by Michael [Parrotte] that we would not be the exclusive distributor." (Hart Dep. 76:3-5, July 25, 2012, ECF No. 49-4);

(2) Greg Blackwell, LeMans's Vice President of Sales, testified that "to [his] knowledge," LeMans was the exclusive distributor of AGV Sports product until August 31, 2009. (Blackwell Dep. 8:15-17, July 24, 2012, ECF No. 49-5);

(3) John Holzhuter, LeMans's General Counsel, testified that LeMans was the exclusive distributor as of May 5, 2009, in the United States for AGV Sport products. (Holzhuter Dep. 9:9-12, July 24, 2012, ECF No. 49-6);

(4) Lou Lopez, LeMans's National Sales Manager, testified that LeMans was an exclusive distributor of AGV Sports products. (Lopez Dep. 8:22-24, July 24, 2012, ECF No. 49-7); and

(5) Mike Collins, Lemans's Vice President of Purchasing, testified that LeMans was the exclusive distributor for AGV Sports products through August 2009. (Collins Dep. 29:20-23, July 24, 2012, ECF No. 49-8).

---

commission. (See Pl.'s Motion at 3). In reviewing LeMans's Opposition, marked as Exhibit A to Plaintiff's Motion, the only statement it directly supports is that LeMans would place orders directly with the manufacturer. Nowhere does the document state that LeMans is the exclusive distributor, and it states that after 2007, the parties never agreed upon a commission. (See Def.'s Opp'n to Pl.'s Mot. Summ. J. at 5, ECF No. 19). AGVSG did not include these assertions in the argument section of its second Motion. Accordingly because AGVSG's reliance on the document is unfounded, the Court will summarily dismiss this argument.

Although the foregoing testimony may support the contention that LeMans operated as an exclusive distributor of the AGV Sport product line through August 31, 2009, AGVSG never alleges on whose authority the Interim Agreement was created. AGVSG merely lists the testimony of LeMans employees, who may have lacked the authority to bind LeMans to the purported Interim Agreement.

Indeed, while several LeMans employees testified that LeMans continued to be an exclusive distributor of AGVSG products upon expiration of the Initial Agreement, a modicum of scrutiny reveals that LeMans's employees dispute whether there was an Interim Agreement for an exclusive distributorship between the parties. Mr. Holzhuter, for example, testified that there was no exclusive distribution agreement between the parties and that their relationship was governed only by the terms of individual purchase orders[4] that LeMans issued directly to product manufacturers after the Initial Agreement expired:

---

[4] The terms of the purchase orders support LeMans's contention that genuine issues of material fact exist as to whether the parties formed an Interim Agreement. Specifically, LeMans reserved the right to rescind the purchase order and place the order elsewhere. (See Def.'s Mem. Opp'n to Pl.'s Mot. Partial Summ. J. ["Def.'s Resp."] Ex. H ["Purchase Order"] ¶ 13, ECF No. 55-9). That an exclusive dealing contract existed amidst this clause strains credulity. Similarly, the purchase order contained integration clauses and rejected all prior courses of dealing, course of performance, and discussions whether oral or written. (Id. ¶ 10) ("This Order contains all representations and agreements between LeMans and Seller with

Q: What were the terms of that distribution agreement?

A: The terms were included in our purchase orders that would have been sent out regarding the purchases of product that we made.

Q: Did the agreement terminate at some point?

A: Our purchase orders?

Q: The distribution agreement?

A: **I'm not sure what distribution agreement you're referring to.**

Q: Well, under what term was LeMans the distributor as of May 5, 2009?

A: We would issue purchase orders to purchase AGV Sports products.

. . . .

Q: What was the end of the 2009 selling season?

A: Fall of 2009.

Q: Was the end of the agreement August 31, 2009?

A: **I'm not sure what agreement you're referring to.**

Q: The exclusive distribution agreement.

---

regard to the subject matter hereof and, as such, shall supersede all prior courses of dealing, usage of trade, course of performance, negotiations, discussions and understandings, whether oral or written."). Maryland law generally recognizes the validity and effect of integration clauses. See, e.g., Pumphrey v. Kehoe, 276 A.2d 194, 199 (Md. 1971) (noting that an integration clause, "although not absolutely conclusive, is indicative of the intention of the parties to finalize their complete understanding in the written contract"); Kasten Constr. Co. v. Rod Enters., Inc., 301 A.2d 12, 17-18 (Md. 1973) (explaining that courts generally should not look beyond the contract to evidence of prior statements or agreements, especially when the contract contains an integration clause).

>     A: The request from AGV Sports, as I understood it,
>        was that we would carry the product into the,
>        into the start of the 2010 selling season. And
>        that is typically related to when new catalogs or
>        new products are released. And without reviewing
>        a number of documents, I don't recall the exact
>        date that would have occurred in 2009.

(Holzhuter Dep. 8:20-10:4, ECF No. 55-10) (emphasis added).

Similarly, Mr. Collins testified that the parties did not discuss exclusivity after the Initial Agreement expired or agree to such an arrangement:

>     Q: And what, what was it that determined that the
>        exclusive distributorship would last until August
>        of 2009?
>
>     A: **Well, I don't know that we specifically said that
>        it was going to be an exclusive distributorship.
>        I don't know if that ever came up. That's just
>        the way it had been.** But I think Michael
>        [Parrotte] had asked for us to continue selling
>        it until the 2010 season which in reality, for
>        apparel begins in the fall of 2009.

(Collins Dep. 30:18-31:2, ECF No 55-11) (emphasis added). Mr. Lopez also testified that he never saw such an agreement:

>     Q: What was the agreement that LeMans had with AGV
>        Sport until the end of the relationship.
>
>     A: **I've never seen the agreement that AGV Sport and
>        LeMans had.**

(Lopez Dep. 9:11-14, ECF No. 55-12) (emphasis added).

The existence of an Interim Agreement is further belied by Mr. Parrotte's testimony:

>     Q: Was there ever a written agreement of any sort
>        between LeMans and AGV Sport that required LeMans

12

>           to help AGV Sport meet its minimums for other
>           customers?
>
> A:       It's not a written agreement. . . .
>
> Q:       So is the answer no?
>
> A:       I don't believe so.
>
> Q:       You don't believe that the answer is no, or you
>           don't believe there was a written agreement-
>
> A:       I don't believe the answer is no.
>
> Q:       Okay. So what is the written agreement that
>           LeMans has with AGV Sport to help AGV Sport meet
>           its minimum for other customers?
>
> A:       I think the 1994 contract is clear.
>
> Q:       And that's where the agreement arises from?
>
> A:       I think that the general business dealings, the
>           company, the cooperation, the agreements and
>           relationship that I had with Jeff Fox, everything
>           from 1994 until May 2007 worked along those
>           lines.

(Parrotte Dep. 405:7-406:19).

A cursory review of the record reveals that the foregoing contention flies in the face of the Initial Agreement, which provided that "[a]cceptance of any order from LeMans or any sale made to LeMans by AGV Sport after notice of termination **or after termination of this Agreement shall not be construed as a renewal or extension hereof** nor as a waiver of such notice of termination." (See Initial Agreement ¶ 13(c)). Mr. Parrotte's testimony regarding the lack of definiteness surrounding the

parties' business relationship after termination of the Initial Agreement is similarly debilitating to AGVSG's claim:

> [W]e were in this limbo where we were supposed to be starting the licensing agreement but we were really still doing the work under the distribution agreement. We were sort of this in this [sic] quasi-hybrid, stuck in two worlds between the two agreements waiting for LeMans to figure out what they want to do.

(Parrotte Dep. 274:11-17).

In the Court's judgment, the testimony of LeMans's employees and that of Mr. Parrotte, coupled with the text of the purchase-order agreements between the parties, create a genuine dispute of material fact as to whether there was a meeting of the minds as to the Interim Agreement.  Accordingly, any obligations related to exclusive dealings are also in dispute.

### III. CONCLUSION

For the foregoing reasons, this Court will, by separate order, DENY AGVSG's Motion for Partial Summary Judgment (ECF No. 49).[5]

Entered this 12th day of August, 2013

/s/
_____
George L. Russell, III
United States District Judge

---

[5] Having determined that genuine issues of material fact exists as to the formation of the Interim Agreement, the Court will dispense with analysis of the parties' arguments regarding the enforceability of the Interim Agreement under the statute of frauds.